653 So.2d 253 (1995)
HANS CONSTRUCTION COMPANY, INC., a Mississippi Corporation, and Offshore, Inc., an Alabama Corporation
v.
Peter DRUMMOND d/b/a Drummond Marine.
No. 91-CA-00835-SCT.
Supreme Court of Mississippi.
March 16, 1995.
*254 Eddie C. Williams, Krebs & Williams, Pascagoula, for appellant.
Vincent J. Castigliola, Jr., Bryan Nelson Schroeder Backstrom Castigliola & Banahan, Pascagoula, for appellee.
Before HAWKINS, C.J., and McRAE and JAMES L. ROBERTS, Jr., JJ.
HAWKINS, Chief Justice, for the Court:
On November 15, 1989,[1] plaintiff Peter Drummond, d/b/a Drummond Marine (hereinafter "Drummond") filed a complaint against Hans Construction Company, a Mississippi corporation, (hereinafter "Hans Construction") and Offshore, Inc., an Alabama *255 corporation, (hereinafter "Offshore") in the circuit court of Jackson County. In response, Hans Construction and Offshore filed an answer and counter-claim on February 1, 1990. Drummond, in turn, answered Hans Construction and Offshore's counter-claim on April 11, 1991. After extensive discovery, a hearing was held before a jury on July 16-19, 1991. The jury delivered a verdict awarding both actual and punitive damages to Drummond on July 19, and a judgment for Drummond in the amount of $62,520 actual and $25,000 punitive damages were entered.
Hans Construction and Offshore have appealed.

FACTS
The L/B Titan was 160 feet long, 56 feet wide and weighed 500 tons. Perhaps this vessel's most striking feature was her three legs, each 160 feet long and 56 inches in diameter and each fitted with pads measuring 26 feet by 15 feet. There were two legs on either side of the front of the boat and one leg in the back of the boat. When in use, these legs placed their pads on the sea floor and raised the Titan out of the water, enabling it to work alongside offshore drilling platforms in the Gulf of Mexico.
On June 29, 1989, tragedy struck the Titan when it capsized off the Texas coast with the loss of three lives. After capsizing, the Titan drifted upside down for 18 miles dropping debris along the way, until it finally sank on July 3, 1989, thirty-two miles offshore in 105 feet of water. The debris that was lost as the inverted vessel had floated from the site of its mortal wounding to its watery grave included the aft and front starboard legs as well as the ship's crane.
At the time the Titan sank, Hans Construction Company, led by sole stockholder and company president Joe Hans, and Offshore, Inc., led by company president Lee Statler, were engaged in a joint venture which handled various underwater salvage operations. On July 25, 1989, an initial agreement was reached between the Hans Construction/Offshore joint venture and Coastal Marine Lift Barges, Inc. (hereinafter "Coastal Marine"), the owners of the Titan. A final written contract was then entered into by the parties on July 31, 1989. The pertinent portions of this lengthy contract read:
The OWNER (Coastal Marine) has requested and SALVOR (the Hans Construction/Offshore joint venture) has agreed, subject to the following terms and conditions, to undertake (1) a search for certain salvage items, and (2) wreck removal operations to remove the VESSEL from its current location, raise the barge, deliver same to safe harbor at SALVOR's election, and make the vessel available for reasonable inspection at SALVOR's facility or another agreed location, and make the starboard, port, and after legs available for extensive inspections and testing (destructive and non-destructive) by OWNER and/or its underwriters as deemed necessary.
Provisions for payment are found in Section IX:
The services of the SALVOR under this Agreement shall be rendered on the principles of "Lump Sum" and "No Cure-No Pay." "Cure" for this purpose means completion of the WORK in accordance with Appendix "A" of this Agreement. There shall be no progress payments, payments on invoices or work orders, advances or any payments of any kind by OWNER to SALVOR unless and until "cure" has been fully achieved in accordance with this Agreement. The payment under this Agreement shall be the Lump Sum of $219,000.00 United States dollars for the successful "cure" and completion of all WORK under the Agreement. Payment to the SALVOR shall be made within (15) days of completion of all WORK.
Section XIII. discusses provisions for insurance:
SALVOR agrees to carry or will cause to be carried with an insurance company or companies or underwriters satisfactory to Coastal Marine Lift Barges, Inc. and the Standard Steamship Owners' Protection and Indemnity Association (Bermuda) Limited, insurance coverage with limits of not less than those set forth in the next succeeding subparagraphs, such coverage to include a contractual coverage endorsement *256 for SALVOR's liability assumed under the indemnity and hold harmless provisions of this Agreement. Prior to the commencement of any WORK to be performed hereunder, SALVOR shall procure from the underwriters a certificate or certificates that said insurance is in full force and effect and that the same shall not be cancelled or materially changed without thirty (30) days prior written notice to OWNER and, when requested by OWNER, shall furnish certified copies of all insurance policies.
Prior to the execution of this Agreement, SALVOR has obtained agreement from its insurers to name the L/B TITAN, Coastal Marine Lift Barges, Inc., Delta Lift Barges, Inc., Jude St. Romain, and the Standard Steamship Owners' Protection and Indemnity Association (Bermuda) Limited, as additional assureds and to extend a waiver of subrogation in favor of the VESSEL, and the other named entities, and all Indemnified Parties in all of the insurance policies set forth in this Section XIII plus all insurance policies carried by SALVOR protecting loss of or damage to SALVOR's property and equipment employed in the performance of this Agreement, whether the same be set forth in this Section XIII or not.
This section goes on to list in detail the types of insurance that the Hans Construction/Offshore Inc. joint venture was to obtain. These include Workmen's Compensation Insurance, General Liability Insurance, and Hull and Machinery Insurance. This section also stated that, "SALVOR shall require all subcontractors, including towing companies and barge owners, retained by SALVOR to obtain similar insurance coverages affording complete protection to Coastal Marine Lift Barges, Inc., Delta Lift Barges, Inc., Jude St. Romain, and the Standard Steamship Owners' Protection and Indemnity Association (Bermuda) Limited."
Section XIV contains a provision for time limits. Under this provision, once the joint venture started work at the Titan site, they had 30 days to raise the vessel exclusive of weather delays and 60 days to raise the vessel inclusive of weather delays. Section XV states in part that, "Upon `cure' as defined in Appendix `A', title to the L/B TITAN will be transferred to SALVOR." Attached to the main body of the contract are the scope of work provisions of Appendix "A". This section describes the vessel, the location of its capsizing, and its present whereabouts. It also details what is required of the salvors to complete the contract:
I. SEARCH PHASE: Search bottom, locate and identify hull, port, starboard and after legs, pads, crane and miscellaneous debris (i.e., tools, toolboxes, etc.). The search area shall be one-quarter (1/4) mile around the area where the vessel capsized and the search would be extended to one-half (1/2) mile if the starboard and after legs are not located in one-quarter mile. Furthermore, if the starboard after legs are not located, the OWNER has the right to have a vessel with appropriate equipment locate such legs and SALVOR will mark and recover such legs. In addition, the search area shall be three hundred (300) feet around the sunken barge, but if the port leg is not discovered within this three hundred (300) feet, then the search shall be extended to five hundred (500) feet. If the port leg is not discovered in this search area, then the OWNER has the right to have a vessel with appropriate equipment locate the leg and the SALVOR will mark and recover the leg.
II. RECOVERY PHASE: Recover hull; starboard, port and after legs, and the pads; Recover located debris.
III. REMOVAL PHASE: Remove vessel, port, starboard and after legs, pads, and debris to Hans Offshore Dock at Moss Point, Mississippi.
"CURE" shall be the successful completion of area search, removal of known debris, legs, pads, and hull to Hans Offshore's dock... .
Lee Statler testified at the trial that after the two parties signed the contract, Coastal Marine verbally waived the provisions which required Hans Construction and Offshore to search for the various missing parts.
About the same time the Hans Construction/Offshore joint venture entered into the *257 above contract with Coastal Marine, Statler began to contact Peter Drummond to see if he would help them raise the Titan. Drummond testified that he was at first hesitant to deal with Statler. However, Statler eventually told him that Hans would be financing the operation. Drummond stated that this information was important as,
Joe Hans was a reputable businessman in Pascagoula. I'd talked to some people who do a lot of contract work in Pascagoula and they said he was an upright kind of guy and paid his bills. Lee Statler is pretty well known in the salvage community and he's a real high risk to deal with.
After this conversation with Statler, Drummond personally inspected the wreck site. After he completed his survey, he notified Hans and Statler that he could work on the salvage job.
He met the two of them in their office soon thereafter to negotiate the terms of the contract. Most of these negotiations were with Lee Statler although Hans was in and out throughout the day. Drummond initially quoted them a price of $57,000 with $10,000 up front. Drummond testified that after he gave them these terms, Statler:
[T]old me that all I had to do was go out there and they would tow me out there. I would have no responsibility but to get out there when they got there with the rig. I would rig my end. I would make the pick and do the supervision of the lift. And then they would tow me and the Courageous directly back to Pascagoula. He said that I was asking too much money considering that all I was going to do was drive out to Texas, take their crew boat to my rig, supervise a lift, and then come back.
According to Drummond, Hans and Statler never told him that there was a requirement that he aid in any search or that he stay around while others searched. Drummond further stated that, "I didn't want to participate in a project that successful completion of the wreck meant you find everything that fell off the wreck or even all the pieces of the wreck. And I made it perfectly clear that I was not going to be involved in any type of a bottom search or recovering artifacts off the wreck." According to Drummond, Statler and Hans assured him that he would not have to do any searching and that once the Titan was upright and afloat, "the job was over." During the course of the negotiations, Drummond told Statler and Hans about another of his worries. "I expressed a real concern about [their] just dropping me off and going and doing other jobs. And Joe Hans himself personally assured me that he was running things, none of that would happen. We'd go straight there. We'd do a job. We'd come straight back. There was no problem. It was so easy. So clear."
After Hans and Statler balked at his initial offer, Drummond dropped his price to $44,000 with $10,000 up front. Although Statler initially declined this offer, he called Drummond that night and accepted it, stating that $5,000 of the advance would be paid to him when he left Mobile and the other $5,000 would be paid to him when he reached Pascagoula. Drummond left Mobile the next day using his tugboat the Quarter Horse to tow the engineless Ranger II. Drummond described the Quarter Horse as:
[A] four hundred horsepower, single-screw tugboat. It's a very, very old very small tugboat. I use it primarily for fleeting the Ranger around when I get on a salvage job. And I can make little hops. I can go through the protected waters of the bay and the Intracoastal Waterway to Pascagoula, but I can't go do open towing.
Once he had entered Mississippi waters, Drummond called his wife Sharon and told her to go to see Joe Hans to get $5,000 and get Hans to sign a contract. At the trial, Sharon Drummond testified as to what happened once she arrived at Hans' office.
[H]e ushered me in his office and he shut the door and he said  he just sat down and point-blank looked at me in the face and said, I don't like this. We don't need you on this job. And he told me that Lee Statler didn't have any authority to make us any offers and that he didn't want us on the job. And I was kind of stunned because I wasn't expecting that. And all I was thinking about at that point was I was going to choke Peter for sending me out there to do this.
*258 After talking to Hans, Sharon Drummond notified her husband who paid a visit to Hans' office the next day. After further negotiation, Hans and Peter Drummond reached another agreement. According to Peter Drummond:
[W]e agreed that I would be the salvage master and he agreed that I would do the job for forty-four thousand dollars. Three thousand dollars up front. And since I had no resources of my own, he would have to meet the crew's wages and groceries as they came up. Again, if the job failed, I couldn't be stuck owing a bunch of guys money I had no hope of getting.... [Hans also] told me that he and Lee had just jointly finished a bridge in Alabama and that I would be able to get paid just as soon as the job was done. And that was the big attraction. He himself personally assured me that he would see that I got paid and did not get jacked around.
At this same meeting the two men also discussed how the Titan would be rigged in order to raise it.
On August 6, 1989, the Ranger II left Pascagoula and started moving toward the job site again, towed by the Hans-supplied tugboat Cajun II. Five days later, Hans and Peter Drummond signed a contract provided by Hans which covered the raising of the Titan. This contract reads in pertinent part:
This agreement entered into on this 11 [th] day of August, 1989, by and between Hans/Offshore, Inc. and Drummond Marine shall provide for the participation of Drummond Marine in the salvage operation of the L/B Titan.

Drummond Marine will furnish equipment and rigging to lift one end of the vessel. Drummond Marine shall also furnish manpower and equipment, exclusive of consumables, for the diving and rigging requirements of the sunken vessel. Peter Drummond shall act as salvage master for the project except that the primary lifting points and rigging be at the jacking tubes under the hull, and around the leg between the pad and the hull and shall incorporate double 2 1/2 slings. Should this prove to be unfeasible every effort will be made to raise the vessel with minimum damage.
TERMS OF CONTRACT
Contract between Drummond Marine and Offshore/Hans Joint Venture shall be an extension of the contract between Offshore/Joint Venture and Coastal Marine Lift Barges, Inc. and the Standard Steamship Owners' Protection and Indemnity Association (Bermuda), Ltd. dated 31st, July 1989. Drummond Marine shall be bound by all conditions therein to Hans/Offshore, to include all indemnifications and insurance requirements and scope of work.
PAYMENT
Hans/Offshore agrees to advance funds to Drummond marine not to exceed 33% of the contract amount of $44,000.00. Initial advance payment of not less than $3,000.00 shall be made upon acceptance to this agreement. Subsequent amounts to be advanced as payroll is incurred and work progresses. Any and all advance payment is to be considered a loan until such time as the salvage contact is completed. This is a no cure, no payment contract.
INSURANCE
Drummond Marine agrees to furnish insurance coverages affording complete protection to Coastal Marine Lift Barges, Inc., Delta Lift Barges, Inc., Jude St. Romain, and the Standard Steamship Owners' Protection, Indemnity Association (Bermuda) Ltd., Hans/Offshore, Inc., A Joint Venture, Offshore, Inc. and Hans Construction Co., Inc. individually as additional insureds on the policies in effect for Drummond Marine and to provide a certificate of insurance to demonstrate that these parties are additional insureds. In the event Drummond Marine does not furnish evidence of adequate coverage Hans/Offshore, Inc., A Joint Venture retains the right to secure any needed coverage and deduct the cost from the contract amount. Further more [sic] Drummond Marine shall indemnify and save harmless and defend Hans/Offshore, Inc. and Hans Construction Co., Inc. and Offshore, Inc. individually.
*259 Before Drummond signed the contract he discussed it with Hans. According to Drummond:
I stipulated that I would have to be the salvage master; that I would not go do a no cure, no pay job unless I ran the whole job. There was a clause in the contract that said my contract was an extension of their contract. I told them I couldn't sign that unless I saw their contract. And I hadn't seen their contract. Joe Hans told me that my contract, as extension of your contract, was to cover my lack of documentation and insurance. The insurance on the Ranger [II] to do this job was about fifty thousand dollars. I was getting forty-four thousand dollars. I couldn't go do a job and pay fifty thousand dollars to help them out. And he told me that my contract was an extension of their contract made me like a rental equipment that took them into the protection and covered their documentation and their insurance. And that made a lot of sense to me and I agreed to it.
Drummond further testified that Hans and Statler never indicated to him that the extension phrase in the contract obligated him to do a bottom search or to wait around to lift the results of another's search. According to Drummond, "We had a deal. I would go out there. I would raise my end. I would secure it and I would leave. That was the deal."
The Ranger II was towed by the Cajun II westward from Pascagoula until the morning of August 9. At that point, she was tied to an offshore oil well while Hans Construction and Offshore attended to the unexpected AVCO salvage job. Drummond testified that in the interest of quickly getting underway again, he sent an experienced diver to assist them. Early the next morning, the Ranger II restarted its Cajun II-led voyage to the Titan site, now towed in tandem with the Courageous, a derrick barge owned by Statler. Soon thereafter, the barges arrived at the wreck site off the Texas coast. Once the barges were in place, the barge crews, which had driven to Texas, began a 32-mile trek on crew boats from the coast to the now-anchored barges. According to Drummond, Statler told him that the Courageous was about to go into dry dock as they were on a boat enroute to the Titan.
At the trial, both Statler and Hans gave testimony as to why this was necessary. Statler stated that when the Titan job started, neither the Courageous nor the Ranger II had the proper certification to work more than 12 miles offshore. According to Hans, it was this lack of certification which forced the dry-docking of the Courageous:
I had a source that led me to this surveyor named Ames in Mobile. And in no uncertain terms, I learned that the Coast Guard was being informed as to what was going on with the Ranger and with the Courageous and that they would be apprehended.... I sent the Courageous to the shipyard in order to save our entire operation because here I have had threatening calls from the Coast Guard. I don't know what they are going to do, if they're going to arrest the barge. I don't know what they can do. But I know that I've got to do something in a hurry to save our job. So I got  I made some inquiries about what's necessary. And what was necessary was to get the Courageous recertified. I tiptoed around the point about the Ranger because it wasn't being used on the AVCO job. And I didn't tell a lie. Okay? So, by running a little defilade, I sent the Courageous in, got her certificated and got her back out. And I was able to answer all the questions from there on that the Courageous is headed into port to get certificated. As a matter of fact, it was. I kept the Coast Guard involved with that certification and managed to keep the Ranger from being in jeopardy.
Drummond calculated that the dry-docking of the Courageous delayed the salvage operation about seven days.
Once the Courageous returned from dry dock, work on the Titan began in earnest. At the trial Drummond gave an in-depth description of how the Titan was raised. Wire cables two and a half inches thick were lowered from derricks on both the Courageous and the Ranger II and were slung underneath the wreck. Statler testified that these cables were not rigged the way they *260 had discussed rigging the cables in Hans' office:
I asked him if he had put the cables in the right position so it wouldn't turn over. And he said no, that he'd run them around the front instead of behind the jacking tower as I had expressed to him and Mr. Hans in the office before we took the job over there  before we signed the contract.
In addition using cables to lift the Titan, Drummond also patched the vessel's leaks and pumped air into her. Drummond stated that he used both cables and air instead of just the cables alone because it gave them additional breathing room in case the seas began to get rough. The more air that was pumped into the Titan, the less the Titan weighed; the less weight the derricks had to lift, the less effect rough seas would have on the barges while they were raising the ship.
After the Titan was rigged with the cables and necessary air hoses, the winches on both barges began to pull her off the bottom. As she approached the surface, the air which had been pumped inside of her began to expand. As Drummond stated, "When you go from a hundred and five feet of water to thirty feet of water, the volume of the air triples. So you have triple the lift capability inside the hull itself." As the Titan came within 30 feet of the surface, the air inside her had expanded enough to make her positively buoyant and able to float to the surface without the aid of the cables. Indeed, she began rising so fast that, as Drummond put it, there was "no way in hell" that the winches could keep up with her. Drummond further testified as to the what happened when the Titan began to rise by herself:
Well, the wreck, the Titan, has a very large superstructure on it. It's a lot heavier on the top than it is on the bottom. And the air was in the bottom. Well, with nothing to control it, it just rolled over upside down and came to the surface rolling over. It didn't come to the surface upright and then roll over. It was level on the bottom. It was level up to thirty feet. When it got its own buoyancy, it rolled up out of the slings. In other words, the slings were no longer carrying any weight at all and it began tipping over. And when it got to the surface, it was already well on its way to tipping over, and it came up and rolled over and flopped down  an extremely stimulating moment.
Drummond testified that there was nothing that could have been done with the slings to prevent the Titan from rolling over. Statler agreed that the slinging of the cables had little effect on whether the Titan capsized. Nevertheless, he also stated that Drummond pumped too much air inside her; had less air been used, she would have weighed more and the cables would have lifted her all the way to the surface. Hans disagreed with both Statler and Drummond, saying that if the Titan had been rigged as he had said to, she would not have flipped over. There was also disagreement as to the importance of the Titan's turning over. Drummond stated that, "I didn't feel that the wreck coming upside down was such a big deal. It happens all the time." Statler, however, attributed much more significance to the Titan's flipping, going so far as to say that Drummond was hired "just to help keep the barge from turning over so we could lift it to the surface to preserve the value of the barge." Hans similarly was quite disappointed to hear that the Titan had flipped, testifying that "my heart sunk in my shoes."
Ryan Ulrich, an expert in the field of marine surveying provided by Drummond, also spoke about the raising of the Titan:
The lifting of this rig, this jack-up rig, platform, from a hundred and five foot of water  when it's raised, the salvor/salvage master in just about every case has never laid eyes on that equipment. When you go down and you attempt a salvage or a lift like this, you make your best judgment to bring it up in a prudent condition whereby you don't hurt anybody and that you succeed in the project. You also take into consideration where you are. You're not in some bay or lagoon. You're out in the open waters, thirty-two miles out. The main thing that you want to do is get it up in a reasonable form and reasonable fashion and get it to where you can bring it inside. And if it turns up upside down, that's okay. Bring it in. Get it in controlled conditions and then handle it where *261 you're not going to have inclement weather giving you a lot of problems... . It's hurricane season. Squalls give you a lot of trouble. Get it up and bring it in. Do it.
He further testified that the Titan "came up like most other wrecks, upside down."
After the Titan was raised to the surface, she was secured and towed upside down to a point about ten miles offshore. After three attempts in three days, Drummond and Statler's crews on the Ranger II and the Courageous were able to flip the Titan upright. Drummond stated that it took a total of ten working days to raise the Titan even though "we were actually on the job seventeen days. Seven of the days they were doing whatever it was they were doing and ten of the days we were doing real work." After the Titan was floating upright at the surface on August 30, Drummond considered his work to be done. The Ranger II was towed in while the Courageous stayed anchored offshore. After the Ranger II returned to the shore, her crew got ready to drive back home. According to Hans, he met with Drummond at this time. Hans testified that, "Well, they were all loading in their trucks, piling their gear in and getting ready to go. And I said, `Peter, aren't you going to help me get the legs and crane up? You're supposed to do that. Leave me some help.'" Drummond's account of this meeting was slightly different. He testified that he was first asked to help with the search, a request which he strenuously refused. He further testified that he was never told that he had an obligation under the contract to help them raise additional parts of the Titan. Drummond was eventually convinced to leave Hans and Statler a diver to help them raise the rest of the Titan. However, this diver was ultimately unable to further assist Hans due to an equipment failure.
According to Drummond, the original plan was for the Titan and the Ranger II to be towed back to Pascagoula after the Titan was raised. However, Drummond testified that this changed once the Titan was on the surface:
Lee said that they had a potential sale for the Titan. So they were going to bring the Titan in, clean it up, and let the guys who were going to buy it come and look at it. And if he could sell the Titan in Texas, then he didn't want to incur the expense of towing it all the way to Pascagoula. And he didn't want to tow me all the way to Pascagoula if the sale didn't go through and then come back and get the Titan and take it again.
Drummond further testified that once he realized that there would be a delay, he put the Ranger II, which had been damaged while raising the Titan, into dry dock for repairs. There was some dispute as to how severe this damage was. According to Drummond, once the Ranger II was towed back to shore there was nothing which would have prevented her from being towed back to Pascagoula. Drummond testified that,
We ruptured a tank on the Ranger by colliding repeatedly into the Courageous while rigging the wreck in rough seas... . The tank that was ruptured was a ballast tank. The tank is traditionally kept full of water and that is to counteract the weight on the other end of the Ranger. ... [T]he Ranger had too much freeboard. It rode out of the water too much to make a heavy lift.
In contrast, Statler testified that the damage to the Ranger II was so severe that they had to keep using her pumps simply to keep her afloat. Hans also testified that he had heard that the Ranger II was in dire condition and had to go directly into dry dock. The actual repairs took only three or four days, but it took another four days to get the money together to pay the drydock fees. At this point Drummond had not yet been paid by Hans for his part in raising the Titan.
For whatever reason, be it the forced dry-docking of the Ranger II as stated by Hans and Statler, or the wooing of a buyer for the Titan as stated by Drummond, the Ranger II did not start its return voyage to Mississippi until September 15, 1989, over two weeks after the Titan was raised and uprighted. The Ranger II was towed by the tugboat Miss Keely and was having an uneventful journey until it reached Black's Bayou, Louisiana on September 18. At that point, the Miss Keely pushed her into the beach and secured her to the shore. According *262 to Hans, the owners of the Miss Keely refused to tow it any further due to the Ranger II's lack of offshore certification. Although they had been able to keep her within 12 miles of the shore from Texas to Black's Bayou, Hans testified that they were not sure that they would be able to from Black's Bayou to Pascagoula due to uncertainties about the twelve-mile boundary around the mouth of the Mississippi River. Within a few days the Courageous was also deposited in the Black Bayou area. Hans testified at trial about his subsequent efforts to find someone to tow the two barges home:
Now, what happened, if you'd like to understand that, I called the world over trying to find somebody to bring this Ranger home. At one point, I told the Drummonds if they could find somebody to bring it in, I'd pay it, I'd pay the bill. I said that... . I was frustrated. I was trying to get it home. But the word's out on these barges, they're out of certificate and it's in bad shape.
Hans also testified that the Intracoastal Waterway, the only other route to Pascagoula, was also unavailable because the boom on the Ranger II was too tall to fit under the waterway bridges. Eventually, Hans was able to find someone who could lower the boom on the Ranger II and tow her back to Pascagoula. Drummond stated that the Ranger II was Black Bayou-bound for ten-to-thirteen days. Drummond further testified that he could not bring the Ranger II home himself as he could not afford the towing charge, and as his own tugboat, the Quarter Horse, was too small to do the job.
While the Ranger II was sitting in the Louisiana swamp, Drummond contracted to raise five Core Industries barges which had sunk in the Mississippi sound. Drummond testified that as the Ranger II was unavailable to do the job, he was forced to enter into a partnership with another salvor named Billy Walters, eventually splitting the $120,000 profit with Walters 50/50. According to Drummond, had the Ranger been returned when she was supposed to, he would have been able to bid this job on his own and would have netted the entire $120,000. The Ranger II finally arrived in Pascagoula on October 3 or 4, 1989. It should be noted that although Hans had paid Drummond part of what he was owed under the contract during the course of the salvage operation, $29,200 was still left unpaid when the Ranger II got home.
Hans' efforts to sell the Titan in Texas bore fruit on September 27 when the vessel was sold for $400,000. According to Hans, he sold the Titan only because he was forced to by dire financial circumstances; his original plan was to keep her and eventually rent her out at a rate of five to eight thousand dollars a day. On October 9, Hans received the $219,000 he was owed on his contract with Coastal Marine for raising the Titan. According to Hans, however, expenses for the Titan salvage operation totaled over $340,000. On the same day that he received his check for $219,000, Hans called Drummond into his office and asked him to take less than the still unpaid $29,200. Hans testified that he made this request of Drummond because of his higher than expected expenses which were caused in part by Drummond's performance. Statler also stated that he had told Hans to reduce the amount he would pay to Drummond because the Titan had turned over while being raised, because Drummond didn't leave anyone to help them raise the missing two legs, and because some of Drummond's people were absent in the middle of the job. Drummond left Hans' office after he refused to take less than the contractual amount.
A few days later, Drummond received a check in the mail from Hans for $24,200 with the words "contract in full" or "payment in full" written on it. Returned with this check was an invoice originally sent by Drummond to Hans with the words "Contract not Completed" newly-written on it by Hans and $5,000 subtracted from the total amount due. Disappointed by the amount of the check, Drummond returned to Hans' office. Upon being told that he was not in, Drummond tore up the check and gave it to the secretary. Soon thereafter, the Drummonds contacted an attorney and on November 15, 1989, filed suit.

*263 LAW

The first point addressed by the appellants is whether the court committed error by allowing issue of punitive damages to go to the jury. In addressing awards of punitive damages in contract cases, Progressive Casualty Insurance Company v. Keys, 317 So.2d 396, 398 (Miss. 1975), states that "[p]unitive damages are not recoverable for the breach of a contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort." Id., at 398. The case of Blue Cross and Blue Shield of Mississippi v. Campbell, 466 So.2d 833 (Miss. 1984), builds on Keys by providing a useful discussion of when it is appropriate to submit the question of such damages to a jury. Although dealing with an insurance company's refusal to pay, its lessons are applicable in the case at bar:
In a punitive damages case, it is the responsibility and function of the trial judge, after reviewing all the evidence, to first determine whether the facts of that particular case justify submitting to the jury the issue of such punitive or special damages. [The court] must consider all the evidence and determine if the defendant's conduct was such that the jury should be called upon in turn to decide the justification and amount of punitive damages, or some extraordinary damages.
Upon appeal, it is also the function of this Court to determine from all the evidence whether punitive damages was a proper jury issue.
....
When the presentation of all evidence has been completed by both sides, it is the function and responsibility of the trial court to determine whether the insurance carrier had a reasonably arguable basis, either in fact or in law, to deny the claim. If he finds there was a reasonably arguable basis to deny the claim, then the plaintiff is not entitled to have the jury consider any "bad faith" [or punitive] award against the insurance company.
Any plaintiff asking for punitive damages, or any special or extraordinary damages based upon "bad faith" of an insurance company has a heavy burden.
Id. at 841-42.
Standard Life Insurance Company of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), another insurance case, further states that "if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie... ." Id. at 248.
A useful summary of these cases is provided in three questions posed in Bankers Life and Casualty Company v. Crenshaw, 483 So.2d 254 (Miss. 1985): "Was there an `intentional and unreasonable refusal' to pay a legitimate claim? Was there a legitimate or an arguable reason for failing to pay Crenshaw's claim? Or, was there a `reasonably arguable basis, either in fact or law, to deny the claim'?" Id. at 269 (citations omitted; emphasis original). If the answer to any of these questions is yes, punitive damages do not lie.
When one applies the law to the case at bar, the question becomes: "Was the refusal to pay the full contract amount by Hans Construction/Offshore an intentional and unreasonable refusal to pay a legitimate claim or was there a legitimate or reasonably arguable basis for their non-payment?" An examination of the facts of this case shows that the defendant's conduct falls within the latter category and that the trial judge's allowing this question to go the jury was therefore improper.
Joe Hans stated at trial that he had reduced the final payment to Drummond by $5,000 because his expenses on the Titan job had been higher than he had anticipated and because he thought that Drummond had done an unsatisfactory job. Lee Statler also gave detailed testimony as to why he thought Drummond should be paid less than the contract amount. As Hans and Statler both gave reasonably arguable bases for their non-payment, any punitive damages claim based on this non-payment must therefore fail.
Furthermore, any attempt to base punitive damages on Hans' and Statler's conduct towards Drummond must similarly fail. *264 Legitimate reasons were given by both of the defendants for such actions as delaying the Titan job for seven days while the Courageous was dry-docked and stranding the Ranger II in Black Bayou. While these actions may have inconvenienced Drummond and may have even cost him money, neither one rises to the level of an "intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort." 317 So.2d at 398.
Hans and Statler provided reasons for their refusal to pay and their conduct towards Drummond that were at least arguably reasonable. The trial judge's submission of the issue of punitive damages to the jury was therefore in error and any award of punitive damages is reversed and rendered.
Next, appellants Hans Construction and Offshore, claim that the court abused its discretion by awarding prejudgment interest. It is well established that:
Mississippi recognizes judicial authority to award prejudgment interest to a prevailing party in a breach of contract suit. An award of prejudgment interest rests in the discretion of the awarding judge. Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith.
Warwick v. Matheney, 603 So.2d 330, 342 (Miss. 1992) (citations omitted).
Key to the awarding of prejudgment interest is the requirement that there be a liquidated amount due or a frivolous or bad faith denial of a claim.
The case below was based primarily on the disputed question of how much was due under the contract between Hans/Offshore and Drummond. It should be noted that the fact that a specific amount was provided by the contract does not make the amount owed definite. Hans and Statler both testified regarding Drummond's failure to fulfill his part of the contract which raised valid questions as to how much he should be paid and which made the exact amount owed uncertain. An award of prejudgment interest cannot, therefore, be based on a liquidated amount. Furthermore, as demonstrated in the discussion of punitive damages above, there is also not adequate evidence of a frivolous or bad faith denial of the claim upon which to base an award of prejudgment interest. Hans and Statler both gave reasonable explanations for their non-payment which removed their refusal to pay from the realm of frivolousness and bad faith.
As there was no liquidated amount or bad faith present in the case at bar, the judge abused her discretion in awarding prejudgment interest. Her decision to do so is therefore reversed.
The appellants also charge that the verdict of the jury in its award of actual damages was excessive and not supported by the evidence. South Central Bell v. Epps, 509 So.2d 886 (Miss. 1987), states that:
In City of Jackson v. Locklar, 431 So.2d 475 (Miss. 1983), we stated that when reviewing the verdict of a jury, we will consider the evidence in a light most favorable to the plaintiff, together with all reasonable inferences that can be drawn therefrom. Locklar, 431 So.2d at 478, 481. Further, we have held that when an issue of damages is properly before a jury, their verdict will not be vacated or reduced unless it is so out of line in light of the evidence so as to shock the conscience of the court. Anderson v. Jaeger, 317 So.2d 902, 907 (Miss. 1975).
509 So.2d at 895.
Drummond, the plaintiff in the case at bar, was awarded $62,520 in compensatory damages by the jury. Appellant Hans/Offshore complains on appeal that this large amount was not supported by the facts introduced at trial. It was undisputed that the maximum amount left owing on the agreement between Drummond and Hans/Offshore was $29,200. This leaves $33,320 in compensatory damages which were not directly contract-based. At the trial, Drummond testified that because of delays caused by Hans/Drummond's inability to quickly return the Ranger II to Pascagoula, he was unable to handle the Core Industries salvage job by himself. Instead, he was forced to enter into a partnership with Billy Walters and eventually had to split $120,000 in profits with him. This purported $60,000 in lost profits provides a sufficient basis for *265 the jury's award of $33,320 in non-contract damages. It bears noting that Drummond's testimony on this subject was not undisputed. Nevertheless, it is the job of the jury to evaluate the testimony of the various witnesses and determine whose testimony rings the most true.
As stated above in Epps, this Court will not reverse the findings of a jury unless they are so out of line in light of the evidence so as to shock the court's conscience. An examination of the record shows that the findings of the jury were not unfounded and are not in any way shocking. The jury's award of $62,200 in compensatory damages is therefore affirmed.
The next issue raised on appeal concerns whether the court committed error by allowing the introduction of evidence of Hans/Drummond's course of conduct. Rule 401 of the Mississippi Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Furthermore, Rule 403 of the Mississippi Rules of Evidence reads, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Finally, Rule 406 states that,
Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.
M.R.E. 406.
Appellant Hans/Offshore claims on appeal that Drummond introduced a great deal of evidence during the course of the trial that was either not relevant under Rule 401 or substantially more prejudicial than probative under Rule 403. He specifically points to:
1. Evidence of a contractual dispute between Hans/Offshore and World Marine Transport and Salvage, Inc.
2. Evidence of a dispute over a final invoice from Johnny Price, one of the divers hired by Hans/Offshore.
3. Evidence of an alleged delay of the contract with Drummond due to the fact that Hans/Offshore performed a separate salvage contract on the AVCO 5 drilling rig before going to Texas.
4. Evidence that Hans/Offshore and the towing firm of Doucet & Adams became involved in a dispute that lead to litigation several months after the completion of the Titan salvage job.
5. Evidence that Lee Statler, owner of Offshore, Inc., one of the joint venturers, attempted to interfere with a contract between Walters Diving and Core Industries, Inc. involving the salvage of the barges in the Pascagoula River Channel.
6. Evidence that Hans/Offshore had problems with the potential buyer of Titan the, which the Plaintiff attempted to characterize as an attempt by Hans/Offshore to renege on still another contractual obligation.
According to Drummond, this evidence was introduced in an effort to establish a course of conduct followed by Hans and Statler in their business affairs in general. If Drummond had sued Hans/Offshore for compensatory damages only, this evidence of their dealings with other parties might well be irrelevant. However, as Drummond also sued them for punitive damages based on an allegedly bad faith failure to pay, evidence which tended to prove that Hans/Offshore had a routine practice of bad faith dealings with other companies became important and, under Rule 401 and Rule 406, relevant. The only question that remains is whether this information was substantially more prejudicial than probative under Rule 403. This rule is meant to keep out evidence in only the most extreme circumstances. When one applies Rule 403 to the facts of the case at bar, it is clear that none of the complained of evidence approaches being harmful enough to force exclusion under the high standards of this rule.
The course of conduct evidence introduced by Drummond was relevant and was not *266 substantially more prejudicial than probative. The admission of this evidence by Judge Jackson was therefore proper and is affirmed.
Finally, Hans/Offshore claims that the verdict of the jury denying their counter-claim was against the overwhelming weight of the evidence. According to Hans/Offshore, Drummond failed to fulfill their contract in two significant ways  the Titan inverted when he initially lifted it and he failed to effectively assist them in retrieving the Titan's legs. It is upon these two purported failures that Hans/Offshore based their counter-claim against Drummond. A great deal of testimony and evidence was introduced at trial which corroborated Hans/Offshore's claims of misfeasance. However, this testimony was not uncontroverted. According to Drummond and his expert, Ryan Ulrich, under the circumstances, it was not an error to raise the Titan so that it turned over on the way up. Ulrich even went so afar as to say that most wrecks come up upside down. Drummond also testified that he had been assured when he signed the contract that he would not have to wait around while someone else conducted a search for the Titan's missing pieces. According to him, once he raised his end of the vessel, his obligation was over.
It is well established that this Court gives "great weight and deference to juries on findings of fact and will not set aside a verdict unless it is against the overwhelming weight of the evidence and credible testimony." Parker v. Thornton, 596 So.2d 854 (Miss. 1992). Furthermore, according to Samuels v. Mladineo, 608 So.2d 1170, 1180 (Miss. 1992), "no jury verdict should be set aside lightly; the occasion for doing so should never arise except in rare and unusual cases." There was ample evidence introduced at trial to support the jury's denial of Hans/Offshore's counter-claim. Certainly, the record contains no indication that this verdict was against the overwhelming weight of the evidence. This portion of the jury's verdict is therefore affirmed.
Hans and Statler both provided reasons for their non-payment and mistreatment of Drummond which were at least arguably reasonable. Therefore, the issue of punitive damages should not have been submitted to the jury and any subsequent award of punitive damages is therefore reversed and rendered. Furthermore, as either a liquidated amount or an instance of frivolous or bad faith non-payment is necessary before one may award prejudgment interest, and as no such amount or non-payment was present in the case at bar, Judge Jackson's award of such interest to plaintiff Drummond is also reversed and rendered.
There was sufficient evidence in the record to support both the jury's award to the plaintiff of $62,520 in actual damages and their denial of defendant Hans/Offshore's counter-claim. These two holdings by the jury are therefore affirmed. Finally, course of conduct evidence introduced by Drummond at trial was relevant and was not substantially more prejudicial than probative. Its admission by Judge Jackson was therefore proper and is affirmed.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
NOTES
[1] The clerk's stamp on Drummond's Complaint is actually dated November 15, 1988. As the events of this case happened in the late summer and early fall of 1989, it is safe to assume that this date is off by one year.