# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CA-00958-SCT

*J. MARTY JENKINS, CARLO M. SANTANGELO AND FIRST BANK*

*v.*

*CST TIMBER COMPANY, J. ALAN PRIEST AND RENEE BICKHAM PRIEST*

*AND*

*CST TIMBER COMPANY, J. ALAN PRIEST AND RENEE BICKHAM PRIEST*
*v.*

*J. MARTY JENKINS, CARLO M. SANTANGELO AND FIRST BANK*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/02/1996 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES: | T. MACK BRABHAM |
| | DENNIS L. HORN |
| ATTORNEY FOR APPELLEES/CROSS-APPELLANTS: | GREGG L. SPYRIDON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 06/08/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/29/2000 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This is a case in which the plaintiffs sued for failure to pay employment commissions. The defendants countered that the plaintiffs owed them for lost profits as a result of plaintiffs' allegedly fraudulent activities. The jury awarded damages to both plaintiffs and defendants. However, because the trial court erroneously excluded expert testimony on both sides, we reverse and remand for a new trial.

¶2. On May 4, 1994, J. Marty Jenkins and Carlo M. Santangelo filed suit against CST Timber Company, J. Alan Priest, and Renee Bickham Priest for breach of an employment agreement demanding payment of unpaid commissions on timber and timberland purchases. CST filed a counterclaim against Jenkins and Santangelo for past lost profits as a result of allegedly fraudulent activities. CST, et. al., eventually amended their counterclaim to include First Bank as a counter-defendant, contending that the bank not only knew of fraudulent activities and failed to disclose them to CST, but also that the bank actively participated in the fraud, thus breaching fiduciary duties and the duty of confidentiality, good faith, and fair dealing to CST. First Bank then filed a claim against CST and the Priests, seeking damages for failing to apply proceeds from the sale of timber on loans secured by the timber (being "out-of-trust").

¶3. After extensive discovery and pretrial maneuvering, this matter went to trial on June 3, 1996, in the Circuit Court of Amite County and lasted a full three weeks. The jury returned a verdict for Jenkins in the amount of $21,929.92 and for Santangelo in the amount of $11,008.62 against CST. CST and the Priests received a verdict against Jenkins and Santangelo for $24,140.15. A defense verdict was returned for First Bank. Judgment was entered accordingly. Now all parties appeal and cross-appeal.

¶4. Having read the transcript and the briefs of the parties, we sympathize with the trial court. The parties, it seems, were unable to see the forest for the trees. Notwithstanding the obstacles provided by the briefs, we have been able to conclude as follows: finding no reason to warrant reversal of the verdict for the Bank, we affirm with respect to First Bank. However, we find that the trial court erred in excluding expert testimony for both Jenkins/Santangelo and for CST and thus reverse and remand for a new trial as to these parties. Given that reversal on these issues will require a new trial, we discuss only those issues on which we reverse.

## FACTS

¶5. Marty Jenkins began working for CST, owned by Alan and Renee Priest, in 1990 as a timber buyer and eventually was promoted to operations manager. With Jenkins's assistance, Santangelo began working for CST in 1992 as a timber buyer as well. Both Jenkins and Santangelo initially would be paid according to commissions earned on purchases of timber tracts. In 1992, Alan Priest, Jenkins and Santangelo decided that they would buy timberland as well, if it were profitable to do so, with Jenkins and Santangelo each receiving twenty percent commissions on purchases, and the remaining sixty percent going to CST. Jenkins alleges that Alan Priest also agreed to pay him a five percent override for the hiring and training of new buyers (like Santangelo), based on the new buyer's net profits.

¶6. This arrangement worked smoothly until about March of 1993. What followed was a heated dispute as to amounts of money owed and allegations of fraud and interference with contracts. Jenkins alleges that CST owes him unpaid commissions on Santangelo's sale of a tract from which CST made $90,000 profit.

Apparently, Santangelo received his commission, but Jenkins never received his twenty percent commission, $18,000. Jenkins alleged that Alan Priest promised to pay this money later, but never did pay him. Jenkins also claimed to not have been paid his five percent override on the Santangelo tract. Jenkins alleged that he was owed commissions on the Talmadge and Wilkinson tracts as well, along with money promised him for assistance with the construction of the Priests' home.

¶7. Jenkins claims that, after Alan Priest found out how much he made on the sale of the Dickerson tract, Priest told him that he could not buy any more timber or timberland on his own. Jenkins says that after he and Santangelo threatened to quit, Alan Priest changed his mind and said they could make purchases with his blessing. Jenkins then claims that he and Alan agreed that any purchases he made would be in his name, and the tracts would be transferred to CST when he received the money owed him.

¶8. After Alan Priest refused to buy the Mike's Island tract, Santangelo quit, followed by Jenkins. They claim that when they quit, they were still owed unpaid commissions.

¶9. On the other hand, CST claims that Jenkins and Santangelo, with the help of Benoyd Bell, a loan officer at First Bank, defrauded them by engaging in activities that were detrimental to CST, while Jenkins and Santangelo were still employed by the company. CST alleges that Jenkins and Santangelo had solicited, negotiated and purchased timber and timberland for their own personal use and to the detriment of CST, namely the Amacker tracts. CST also alleges that Bell financed these purchases through First Bank, knowing that the purchases would be detrimental to CST. CST claims that Jenkins, Santangelo and Bell did the same thing for other Amacker tracts and a Hudson tract.

¶10. CST also claims that Jenkins engaged in check kiting, sanctioned by Bell, that Bell violated First Bank's internal loan policies by making loans to Jenkins and Santangelo, and that First Bank, through Bell's actions, knowingly assisted Jenkins and Santangelo in committing fraudulent activities adverse to CST, thus breaching the alleged fiduciary duty and duty of good faith and fair dealing owed by First Bank to CST.

**The court erred in excluding testimony related to the issue of punitive damages and erred in failing to allow plaintiffs to proceed to the jury on the issue of punitive damages.**

¶11. Punitive damages are allowable in cases of gross negligence, *Mutual Life Insurance Co. of New York v. Estate of Wesson by Hall*, 517 So. 2d 521 (Miss. 1987); punitive damages are allowable for oppressive and intentional misconduct, *Defenbaugh and Co. of Leland, Inc. v. Rogers, By and Through Thompson*, 543 So. 2d 1164 (Miss. 1989); punitive damages are allowable for battery, *Strickland v. Rossini*, 589 So. 2d 1268 (Miss. 1991). However, punitive damages are not recoverable if no actual damages are allowed. *Herrington v. Spell*, 692 So. 2d 93, 104 (Miss. 1997).

¶12. The trial court must decide whether the party requesting punitive damages has introduced evidence sufficient to warrant a punitive damage instruction. *United States Indust., Inc. v. McClure Furniture Co.*, 371 So. 2d 391, 393 (Miss. 1979). On appeal, this Court must look at the elements of the punitive damages and decide whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could have found either malice or gross neglect/reckless disregard. *Colonial Mortgage Co. v. Lee*, 525 So. 2d 804, 808 (Miss. 1988).

¶13. Relying on *Hans Constr. Co. v. Drummond*, 653 So. 2d 253 (Miss. 1995), Jenkins and Santangelo argue that there were numerous instances where other employees of CST had promises broken to them

repeatedly and were not paid for their services. As a result, they claim that such testimony was admissible, specifically because they alleged punitive damages. This Court noted in **Drummond** that because "Drummond also sued [Hans Construction] for punitive damages based on an allegedly bad faith failure to pay, evidence which tended to prove that Hans/Offshore had a routine practice of bad faith dealings with other companies became important and, under Rule 401 and Rule 406, relevant." **Drummond**, 653 So. 2d at 265.

¶14. Jenkins and Santangelo concede that they were able to get into evidence testimony regarding a history of broken promises by the Priests with other timber buyers of CST, Wayne Pourciau and Randy Caston. The trial court prevented Gordon Netterville from testifying regarding whether Roy Havard received commissions that were due to him. The trial court referred to its prior ruling on a motion in limine and felt that the evidence was simply inadmissible because it was bad character evidence. However, as long as the evidence tended to prove that the Priests and CST had a routine practice of bad faith dealings, Netterville's testimony was relevant. The trial court erred in not allowing Jenkins and Santangelo to present testimony regarding past bad faith dealings of the Priests and CST.

¶15. If Netterville's testimony had been admitted, there may be evidence to make a jury question as to punitive damages. On retrial, and after the excluded evidence is admitted, the trial court should then determine if a jury should be allowed to weigh the evidence and determine whether a basis for a punitive damages award exists.

> **Whether the Court erred in excluding the testimony of fraud expert, Ralph Summerford, a forensic accountant, in light of the fraud allegations, who was expected to testify about the manipulation of bank documents, check kiting schemes, false statements on loan applications and financial statements, alter ego schemes, potential for kickbacks to a loan officer, conflict of interest and violations of banking policies, all of which were alleged fraudulent activities committed by Jenkins, Santangelo and First Bank as part of a conspiracy, resulted in harm to CST.**

¶16. Ralph Summerford, a forensic accountant, was slated to testify regarding five areas related to the alleged fraud against CST: misrepresentation; check kiting; loan fraud; alter-ego scheme; and conflict of interest. The trial court determined that Summerford could only testify about conflict of interest and could not use the word "fraud" in his testimony. The cross-appellants now claim that Summerford's testimony on check-kiting, loan fraud, and alter-ego scheme would have aided the jury in its fact-finding mission. They also claim that Summerford's testimony could have helped to establish that Jenkins and Santangelo, assisted by First Bank, made material misrepresentations. The cross-appellees contend that Summerford should not have been allowed to testify because: 1) he was not able to give an opinion to a reasonable certainty; 2) his testimony was not based on facts; and 3) his testimony would have effectively been jury instructions not based on legal elements.

¶17. Forensic accountants are commonly employed to uncover fraudulent schemes or to determine whether certain activities comply with business standards. *See, e.g.,* **United States v. Carrozzella**, 105 F.3d 796 (2d Cir. 1997); **Vihko v. Commonwealth**, 393 S.E.2d 413 (Va. Ct. App. 1990). A review of the proffer of Summerford's testimony reveals that he would have testified as to whether certain transactions were fraudulent, that check-kiting occurred, and that First Bank had knowingly made overstatements in certain financial statements that served to defraud CST. Summerford would explain how certain representations

made by Jenkins, that were known about by First Bank, would amount to a fraudulent scheme.

¶18. The trial court wisely concluded that it would not be helpful to the trier of fact for an expert to place a "fraud" label on certain transactions. While it is true that an expert opinion which embraces an ultimate conclusion to be reached by the finder of fact is not rendered inadmissible solely for that reason, the trial court has the obligation to determine whether permitting such an opinion to be expressed is truly helpful to the fact finder. *Alexander v. State*, 610 So. 2d 320, 334 (Miss. 1993) ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Rule 704 does not result in the admission of all opinions. It is an absolute requirement under Rules 701 and 702 that opinions must be helpful to a determination of the case before they are admissible."); *Lentz v. State*, 604 So.2d 243, 246 (Miss. 1992)(The general standard of review for a trial court's decision on a question of admissibility of an expert's opinion is whether the expert's testimony would "assist the trier of fact in making a determination on the ultimate issue."). Moreover, we have been careful to exclude proffered opinions regarding the intent of actors as it relates to mens rea, malice and the like. *Morris v. State*, 748 So.2d 143, 148 (Miss. 1999)("The issue of intent must be decided by the jury from the evidence in the case and not the conclusions of others."); *see also Garrison v. State*, 726 So.2d 1144, 1150-51 (Miss. 1998) (quoting *Newell v. State*, 308 So. 2d 71, 73 (Miss.1975)).

¶19. Fraud of the kind here alleged involves intent. To the extent that an "expert" testifies that a certain transaction was "fraudulent," that expert testifies to intent. It is this view that guided the Montana Supreme Court in *Durbin v. Ross*, 916 P.2d 758, 762-63 (Mont. 1996). That court held that in the context of fraud, elements of knowledge and intent are issues which juries regularly face and determine without assistance from expert testimony.

¶20. Because the trial court erred in limiting expert testimony on both sides, we reverse and remand for a new trial for Jenkins/Santangelo and CST/Priests. Finding no error in the jury's verdict for First Bank, we affirm as to First Bank.

¶21. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART. ON CROSS APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PITTMAN AND BANKS, P.JJ., SMITH, MILLS, WALLER, COBB, AND DIAZ, JJ., CONCUR. PRATHER, C.J., CONCURS IN RESULT ONLY.**